# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| **Vitamin Energy, Inc.,** | Case No. |
| Plaintiff, | |
| vs. | |
| **Manoj Bhargava, Living Essentials, LLC, International IP Holdings, LLC, Innovation Ventures, LLC,** | **COMPLAINT** (Jury Trial Demanded) |
| Defendants. | |

Plaintiff Vitamin Energy, Inc. ("Vitamin Energy"), by and through its undersigned attorneys, for its Complaint against Defendants Manoj Bhargava, Living Essentials, LLC, International IP Holdings, LLC and Innovation Ventures, LLC, alleges as follows:

1.     The Defendant entities are a group of related companies founded, owned and/or controlled by Defendant Bhargava that market and sell 2-ounce energy shots under the name 5-hour ENERGY.

2.     Through various concerted and illegal acts, Defendants have obtained and maintained a monopoly in the energy shot market in violation of the Sherman Anti-Trust Act, 15 U.S.C. § 1, *et seq.*.

3.     By obtaining and maintaining a monopoly in the energy shot market Defendants have harmed other competitors selling energy shots, have harmed consumers who purchase energy shots and have directly harmed competition in the energy shot market.

4.     Vitamin Energy participates in the energy shot market by making and selling 2-ounce energy shots with various attributes desired by consumers and competes with Defendants in the market.

5.     Defendants' illegal actions have directly impacted and harmed Vitamin Energy in ways described in this Complaint, resulting in lost sales, lost profits and loss of market share that Vitamin Energy would have obtained and enjoyed in the absence of Defendants' illegal conduct.

6.     Defendants have also engaged in false advertising by making false claims in television and social media ads directed to consumers and on product packaging about the qualities or attributes of their 5-hour ENERGY shots. These

false claims have the tendency to deceive and have deceived substantial numbers of consumers to believe that 5-hour ENERGY shots have positive attributes that they do not possess, are superior to competing energy shots when they are not, and that consumers should purchase 5-hour ENERGY shots rather than competing energy shots. Defendants have profited from this false advertising and consumer deception by making sales that they would not otherwise have made. Defendants' false advertising is illegal under Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B)

7.     Defendants' concerted actions to accomplish these illegal acts also constitute actions in furtherance of a civil conspiracy.

## I.  PARTIES

8.     Plaintiff Vitamin Energy, Inc. ("Vitamin Energy") is a Delaware corporation.

9.     Defendant Manoj Bhargava ("Bhargava") is a resident of the state of Michigan.

10.     Defendant Innovation Ventures, LLC ("Innovation Ventures") is a Michigan limited liability company organized July 7, 2000 with its principal place of business in Farmington Hills, Michigan.

    a. On August 14, 2008, Innovation Ventures filed a Certificate of Assumed Name to transact business under the name "Living Essentials."

3

b. At certain times relevant to this Complaint Innovation Ventures described itself publicly and in court filings as "Innovation Ventures, LLC d/b/a Living Essentials."

c. On March 13, 2008, Innovation Ventures Filed a Certificate of Termination of Assumed Name to stop using the assumed name of "Living Essentials."

11.     Defendant Living Essentials, LLC ("Living Essentials") is a Michigan limited liability company organized on March 13, 2008 with its principal place of business in Farmington Hills, Michigan.

12.     Defendant International IP Holdings, LLC ("International IPH") is a Michigan limited liability company organized on June 18, 2012 with its principal place of business in Bloomfield Hills, Michigan.

a. On April 5, 2013, International IPH filed a Certificate of Assumed Name to transact business under the name "Living Essentials Marketing LLC."

b. On March 14, 2024, International IPH filed a second Certificate of Assumed Name to transact business under the name "Living Essentials Marketing LLC."

13.     Bhargava founded or directed the founding of, controlled, and continues to control Living Essentials, International IPH, and Innovation Ventures.

14. There are numerous other related entities in the group of companies associated with the sales and marketing of 5-hour ENERGY shots.

    a. For example, in addition to Living Essentials LLC, there are currently active or recently dissolved (in 2023) four other apparently related Michigan entities with the same registered address of 38955 Hills Tech Drive, Farmington Hills, MI:  Living Essentials Equipment Holdings, LLC; Living Essentials Holdings, LLC; Living Essentials IP Holdings, LLC; and Living Essentials Properties, LLC.  These entities were formed in 2008 and dissolved in 2023.  At this time their specific involvement in or contributions to the actions alleged in this Complaint are unknown.

    b. In addition, there are two other Living Essentials entities with a registered address of 39533 Woodward Ave, Suite 318, Bloomfield Hills, MI:  Living Essentials Brazil, LLC; Living Essentials South Africa, LLC.  The address appears to be the Bloomfield Hills office of the McDonald Hopkins law firm. These entities were formed in 2012 and dissolved in 2023.  At this time their specific involvement in or contributions to the actions alleged in this Complaint are unknown.

    c. In addition, there are four other Michigan entities apparently related to Innovation Ventures, LLC:  Innovation Ventures Acquisition Co.,

LLC; Innovation Ventures Equipment Holding Co., LLC; Innovation Ventures Finance Corp. (dissolved March 15, 2022); and Innovation Ventures Holdco, LLC.  At this time their specific involvement in or contributions to the actions alleged in this Complaint are unknown.

d. In addition, Manoj Bhargava has recently been widely alleged to have created a complex corporate structure to cheat on his taxes and defraud the US.  See *He Was a Monk, Then a Billionaire and Now an Alleged Tax Cheat*   https://www.wsj.com/us-news/law/monk-billionaire-5hourenergy-irs-573c764b

15.    Defendants work together to promote and market 5-Hour ENERGY products.

16.    To the extent that the numerous related companies are found to have participated in or aided others in performing the illegal acts herein, or to the extent that the named Defendants claim that these other entities, or any of them, are responsible for the acts alleged, Vitamin Energy reserves the right to later name or substitute those or other entities and individuals as defendants in this action.

## II.  JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over Vitamin Energy's Sherman Act and Lanham Act claims against Defendants under 15 U.S.C. § 1121,

and 28 U.S.C. §§ 1331 and 1338, and it has supplemental jurisdiction over the related civil conspiracy claim under 28 U.S.C. § 1367.

18. This court also has diversity jurisdiction of this case under 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000.00 and there is diversity of citizenship among the parties.

19. Venue is proper in this District 28 U.S.C. § 1391 because all the Defendants reside in this District and a substantial part of the events giving rise to these claims occurred in this District.

### III. FACTS COMMON TO ALL COUNTS

20. Beginning in 2005, the 5-Hour Energy shot was an early entrant in the 2-ounce energy shot market. Examples of early 5-Hour Energy shots are shown below:




21.     5-Hour Energy attained market dominance in the energy shot area, and it has retained a dominant market share.

22.     The energy shot market is segmented by price into premium energy shots selling at or about $3/shot at retail, and value energy shots selling at significantly lower prices, typically at or about $1/shot at retail.

23.     According to beverage industry facts published by Mintel Reports, the size of the energy shot market in the period 2012 to 2022 has been between $800 million and $1.4 billion in annual retail sales.

24.     Crain's Detroit Business magazine reported in its February 20, 2012 issue that the 2011 retail sales of 5-hour ENERGY were $1.2 billion.

25.     5-Hour ENERGY has had market share of 90 percent or more in the entire energy shot market, including both premium and value energy shots.

26.     5-Hour Energy has market power in the premium energy shot market, holding 98 percent or more of the premium energy shot market.

27.     When Manoj Bhargava was asked in an interview at a 2012 beverage industry conference "let's talk about the energy shot category, you guys have north of 90%.  Can you give us a sense of where you guys see things?" Mr. Bhargava responded:

> "I don't really consider this a shot category. For it to be a category you have to have at least 2 relatively major players. In this shot area we have about 92

or 93% and the next guy has just 1.5%.  So it's not really a category, it's a brand (5 Hour Energy)."

https://www.youtube.com/watch?v=tcuZhRYM7sM (around 1:40 into the video).

28.     5-Hour ENERGY has market power in the entire energy shot market, holding 90 percent or more of the entire energy shot market.

29.     The physical location of consumer products in retail outlets has a significant impact on the sales of those products.

30.     Premium energy shots often obtain preferential placement in retail outlets, including at or near the cash register or checkout lanes in in convenience stores and other retailers.

31.     According to Mintel Reports, convenience stores have historically sold from 63% to over 70% of all energy drinks, including both larger drinks and energy shots.

32.     According to Mintel Reports, over 30% of consumers buy energy drinks and shots primarily from convenience stores.

33.     According to Mintel Reports, more than 70% of the time, consumers purchase a single energy drink or shot rather than multiple packs.

34.     Sales display placement at or near the cash register or checkout lane ensures that most retail customers encounter the premium energy shot at or near the point-of-sale.

35.     Energy shots sold at or near the point-of-sale are often placed in racks near the cash register locations and these racks are often expensive to make and distribute.

36.     Placement of an energy shot rack on the counter at or near the cash register point-of-sale is considered placement at a prime location to maximize exposure to consumers and increase sales of energy shots.

37.     As opposed to premium energy shots, value energy shots, such as Stacker 2 and Tweaker, are rarely placed in the same high customer volume point of sale locations that premium energy shots enjoy.  Value energy shots are instead, relegated to the Health & Beauty Aids sections of retail stores or even in the store area devoted to novelty items.

38.     Typical value energy shot Health & Beauty Aids or novelty merchandising placement in stores produces far fewer sales than does the point-of-sale placement more common to premium energy shots.

39.     Vitamin Energy shots placed at the point-of-sale sells in much higher volumes than Vitamin Energy shots placed in the Health & Beauty Aids section. For example, on average, in many convenience store locations, 55 Vitamin Energy shots were sold when placed on the counter at the point-of-sale compared to 2 Vitamin Energy shots sold when placed  in the Health & Beauty Aids section during an equivalent time period.

40.    Many value energy shots are sold at different retail locations than premium energy shots, such as dollar stores.  Notably, only 5 Hour Energy enjoys point-of-sale placement at these dollar stores, where they typically sell for their full $3.00+ retail price while value shots are also relegated to the Health & Beauty Aids section.

**Defendant Bhargava's Close Control and Direction of Defendants**

41.    Defendant Bhargava has exercised and continues to exercise significant personal control over the actions of all Defendants.

42.    Defendant Bhargava is the founder of the company that created 5-hour Energy shots and brought them to market, and he became a billionaire in the process.

43.    Defendant Bhargava's actions in creating his enormous personal wealth were ruthless, cutthroat and deliberately illegal.

44.    Bhargava specifically targeted any energy shot competitor which dared to bring a 2-ounce energy shot to market in competition with 5-hour ENERGY shots.

45.    Under his direction, Defendants filed fifteen or more lawsuits against competitors.

46.    As described in more detail below, multiple judges in this district have found that Defendant Innovation Ventures significantly overreached its legal rights in doing so.

47.     In early 2008, Innovation Ventures ran an advertisement drafted by Defendant Bhargava that falsely stated that all energy shots with "6 Hour" on the bottle had been recalled by a court order that although that order applied only to one specific competitor.   In a March 30, 2009 decision supporting a preliminary injunction against Innovation Ventures d/b/a Living Essentials, Former Chief Judge Rosen of the Eastern District of Michigan enjoined Innovation Ventures from continuing to run ads drafted personally by Defendant Bhargava that falsely claimed that all "6 Hour" energy shots had been recalled from the market.   Supporting that result was the finding that:

> "Living Essentials' statement that it "won a decision against a '6 Hour' energy shot that closely mimicked 5-Hour Energy was misleading in its failure to identify which product was the subject of the decision, thereby casting a cloud on all energy products (including BDI's) that refer to "6-Hour Energy" on their labels."

*Innovation Ventures, LLC d/b/a Living Essentials v. Body Dynamics, Inc. d/b/a DBI Marketing*, 08-cv-12711, 2009 WL 877640 at *2, (E.D. Mich. Mar. 30, 2009) (Rosen, CJ adopting Magistrate Judge's Report and Recommendation).

48.     CB Distributors, Inc. was at one time the largest distributor of 5-hour ENERGY shots in the country.   In a lawsuit filed in 2009 by CB Distributors against Innovation Ventures, LLC d/b/a Living Essentials, CB Distributors states that it had

grown from purchasing $284,000 (wholesale prices) of 5-hour ENERGY in 2005 to purchasing $21,430,000 of 5-hour ENERGY in 2008.

49.     CB Distributors also distributed a competing energy shot called 6 Hour Power.   CB Distributors was negatively impacted by the false advertisement addressed by Judge Rosen in the BDI Marketing case.

50.     The principal of CB Distributors, Carlos Bengoa, met with Defendant Bhargava on June 10, 2008.  As stated in the CB Distributors' complaint:

> "During the June 10, 2008 meeting, Manoj Bhargava said words to the effect that the letter accomplished what he wanted to accomplish, namely to intentionally and deliberately mischaracterize the preliminary injunction and recall order entered in case No. 08-CV-10983."

*CB Distributors, Inc. v Innovation Ventures, LLC d/b/a Living Essentials*, 09-CV-881, Rock County Wisconsin Circuit Court (filed Apr. 13, 2009).

51.     After running a number of competitors out of business through serial litigation, Bhargava gave an interview to Crain's Detroit Business in 2012 that reported on and showed a graveyard set up in Defendant Bhargava's CEO office with the competitors he and his companies had buried:



**Credit:** NATHAN SKID/CRAIN'S DETROIT BUSINESS

In Manoj Bhargava's Farmington Hills office, a grave marker signifies a victory in a "cemetery" of rivals to 5-Hour Energy. Bhargava has a track record of bringing trademark lawsuits against would-be competitors.

52.    As stated in a 2012 article in Forbes magazine, "His [Bhargava's] company, Living Essentials, is the biggest player by far in the energy-shot market, and not because 5-Hour is so delicious. Chalky cough syrup is more like it. The reason Bhargava has won is that he plays tough against competitors. Each has been sued, bullied or kicked off the market by Living Essentials' lawyers. In front of each are little placards with a skull and crossbones drawn in felt-tip pen. Bhargava points at the gravestone of one of his late competitors and says with a chuckle, "Rest in peace."    https://www.forbes.com/sites/clareoconnor/2012/02/08/manoj-bhargava-the-mystery-monk-making-billions-with-5-hour-energy/

14

53.     Defendant Bhargava directed Defendants' aggressive acts to restrict and impair competition in the energy shot market, including bragging to an industry publication about the fact that his companies used aggressive litigation tactics to accomplish their goals. In a 2010 article posted by beverage industry watcher BEVNET.com, Bhargava was quoted as bragging that he was spending more than $1 million per month on legal fees to pursue his strategy of suing competitors, and particularly smaller competitors.

54.     The 2012 Crain's Detroit Business article noted above reported that there have been at least 30 lawsuits involving Innovation Ventures since 2003 in U.S. District Courts around the country.

55.     One example of such aggressive litigation against competitors is seen in the case *International IP Holdings, LLC and Innovation Ventures, LLC v. Green Planet, Inc.*, 2:13-cv-13988, 2016 WL 1242275, (E.D. Mich. Mar. 30, 2016) (Cleland, J.).  In that case plaintiffs alleged trademark and trade dress infringement against a starkly dissimilar competitive product, 8 HR BUZZ:



In applying the likelihood of confusion factors at summary judgment, Judge Cleland found that the products were so dissimilar that the likelihood of confusion was extremely small.  Judge Cleland explained the significant danger that a well-funded competitor with a relatively weak trademark presented to smaller competitors:

> "The danger here is apparent and, the court believes, exemplified by this case. In this environment, established brands claiming protection over words like 'energy' in the energy-shot market can easily use the threat of expensive trademark litigation to bully newcomers out of the market.

*Id.* at *5.

56.    Defendant Bhargava's close control of the Defendants continues to this day, as reported in a May 1, 2024 article in DBusiness.com:

> "While Bhargava maintains the vision for his enterprises, he also gets involved in the nitty-gritty details.  So, for example, while a couple of years ago he hired Jeffrey Sigouin form elsewhere in the consumer-goods industry to helm the 5-hour brand, Bhargava remains deeply involved in the specifics, including personally approving new flavor formulations that are crucial to the shots category.  … 'He approves every flavor because, if it doesn't taste good to him, he doesn't thank anyone else is going to like it,' Sigouin says."

https://www.dbusiness.com/from-the-magazine/media-shot/.

57.    The Defendant entities and their conduct in the market thus reflect and carry out the directions provided by Defendant Bhargava.

58.    As Defendant Bhargava himself acknowledged, by no later than 2012 Defendants enjoyed a monopoly of over 90% of all sales in the energy shot market, and no other competitor had more than 1.5% of the market.

59.    Defendant Bhargava has never wavered from his aggressively anti-competitive course of conduct, which has allowed him and his companies to obtain a monopoly and to continue to monopolize and control the energy shot market.

**Vitamin Energy Brings Desirable New Products to Market**

60.    In 2018, Vitamin Energy began selling VITAMIN ENERGY® brand energy shots.

61.    Vitamin Energy is in the business of making and selling premium energy shots that sell at or about a $3/shot retail price.

62.    Some current VITAMIN ENERGY® shots are shown below:



63.    From its introduction to the market in 2018 through approximately 2020, VITAMIN ENERGY® shots enjoyed the fastest sales growth rate in the energy shot category.

64.    This rapid growth was a result of pent-up consumer demand for both variety and a healthier-for-you energy shot that the market lacked and VITAMIN ENERGY® shots provide.

65.    According to Mintel Reports, among the most significant factors that consumers cite as motivations to try new energy drinks and shots are functional benefits other than providing energy, sugar-free, and flavors that are not too sweet.

66.    Vitamin Energy shots contain vitamins B6, B12 and D, and many versions contain other ingredients providing other functional benefits.  None of the Vitamin Energy shots contain sugar, and the products are designed so that the flavors are not overly sweet.

67.    Vitamin Energy shots thus include attributes most sought by consumers and most likely to motivate consumers to try the product.

## **Vitamin Energy's Rack Placement Agreement with Pilot Flying J**

68.    Pilot Flying J operates gas stations and convenience stores at over 700 locations in 44 states.

69.    Gas stations and convenience stores have been important outlets for the sales of energy shots since the beginning of the energy shot market 20 years ago.

70.    Obtaining point-of-sale display placement in hundreds of prominent convenience stores nationwide was a key component of Vitamin Energy's efforts to promote and grow its new premium energy shots.

71.    For a growing new premium energy shot brand, prominent product point-of-sale placement is critical in establishing, building and communicating brand awareness and the value proposition to consumers of that new brand.

72.    Consumers who see a Vitamin Energy shot on the counter at a point-of-sale checkout location recognize that the product has many of the attributes that motivate consumers to try a new energy shot, can conveniently purchase a single shot, and are more likely to try that product.

73.    Consumers of energy drinks and shots tend to purchase only two or three different brands, so convenient exposure to a new brand is also important to encourage trials and become one of the few brands a consumer will purchase.

74.    Prominent point-of-sale product placement also provides significant additional sales opportunities both in the current retail outlets and in other major

retailers in which the brand seeks product placement, in part because rising sales volume and brand awareness helps to convince other major retailers to carry the brand and to provide prominent product placement in their retail outlets.

75.     In part due to Vitamin Energy's early rapid sales growth and consumer acceptance of and demand for these new energy shots, Vitamin Energy secured a contract to place Vitamin Energy retail display racks on the counter near the cash register at over 500 Pilot Flying J convenience stores in 2020.

76.     The Pilot Flying J placement was Vitamin Energy's first placement in one of the top 25 convenience store chains.

77.     By September 2020, Pilot Flying placed Vitamin Energy's permanent counter display racks in over 500 convenience stores in at least 39 states, for example:





78.     Vitamin Energy spent approximately $40,000 on these permanent counter display racks.

79.     These permanent counter display racks were significant but were only the first phase of sales through the Pilot Flying J relationship, because most Pilot Flying J stores have more than one register, which presented additional

21

opportunities to place more racks with resulting greater exposure, and there were additional Pilot Flying J convenience stores into which Vitamin Energy could reasonably expect to extend its sales based on the success of the initial rack program.

80.     Information Resources, Inc. ("IRI") is a reputable data analytics and market research company that, among other things, tracks information on sales of consumer products at hundreds of thousands of retail stores.

81.     IRI data reports are consumer product sales data compilations that are generally relied on by those in occupations such as energy drink and energy shot makers and sellers, both at the wholesale and retail level.

82.     IRI data is presented to the market as IRI Worldwide numbers (so called because it also tracks data in many foreign markets) and is closely monitored by energy drink and energy shot market participants, including those who make and sell energy shots, and large retailers of energy shots including convenience store chains that offer the primary location for consumer purchases.

83.     IRI Worldwide data shows that sales numbers for Vitamin Energy shots increased dramatically as a result of the Pilot Flying J counter rack program.

84.     This type of dramatic increase in IRI Worldwide numbers signals to market participants, including other convenience store and retail outlets, that a brand is gaining traction with consumers. This in turn helps that brand to obtain placement

in other retail outlets that are important to get the energy shots in front of new consumers and rapidly expand sales.

### Defendant's Anticompetitive Placement Agreement with Pilot Flying J

85.    When Defendants learned of the Vitamin Energy racks, they induced Pilot Flying J to swiftly remove the Vitamin Energy racks along with other Vitamin Energy products from the point-of-sale locations and place the Vitamin Energy shots in a secondary more obscure location, while 5-hour ENERGY shots retained their placement on the counter at the point-of-sale.

86.    On information and belief, the agreement was entered into between Living Essentials, LLC and Pilot Corporation, the corporate owner of Pilot Flying J convenience stores.  It is presently unknown how and to what extent the other named Defendants participated in the inducement, making and/or execution of this agreement.

87.    On information and belief, Defendants entered into an agreement with Pilot Flying J to obtain and maintain dominant placement of 5-hour ENERGY shots on the counter at the point of sale, require significant sales volumes in each convenience store, and pay rebates on the total 5-hour ENERGY with the understanding that Pilot would remove competing energy shots, including Vitamin Energy shots, from preferred counter placements near the cash register.

88.    On information and belief, this anticompetitive placement agreement incentivized convenience stores to devote most or all energy shot counter space to 5-hour ENERGY shots.

89.    On information and belief, Defendants have paid and continue to pay millions of dollars in rebates under this agreement.

90.    On information and belief, as a direct result of this anticompetitive placement agreement, 5-hour ENERGY became the only energy shot displayed at the POS point-of-sale in Pilot stores or at least significantly decreased the presence of any competing energy shots at the point-of-sale in Pilot Flying J stores.

91.    The agreement between Defendants and Pilot Flying J was an anti-competitive and illegal exclusive placement agreement.

92.    Vitamin Energy sales in Pilot Flying J stores were over $225,000 in 2020, which were largely achieved in the last few months of 2020 after the counter racks had been placed at the point-of-sale.

93.    On information and belief, by about the end of March 2021 the Vitamin Energy racks were removed from the counters and were thrown away or destroyed. Vitamin Energy was not consulted or even informed in advance of the removal of these racks.  None of the racks were returned to Vitamin Energy.

94.    In 2021 after the Vitamin Energy racks were removed from the counter location and Vitamin Energy shots were relegated to less prominent

24

placement locations, Vitamin Energy sales in Pilot Flying J stores fell by over 30% to approximately $150,000.

95.     These sales numbers strongly support the conclusion that, although they had just been introduced and may not have been known to customers at Pilot Flying J, the counter rack placement at the point-of-sale resulted in at least 5 times the sales volume of Vitamin Energy shots relegated to less prominent placements.

96.     As more consumers tried Vitamin Energy shots, the volume of sales through the convenient and prominent counter rack locations at the point-of-sale would have grown exponentially. For example, Amazon sales data show that Vitamin Energy customers spend over $400 annually and make repeat purchases at twice the rate of Vitamin energy's closest competitor.  This data confirms the high repeat purchase rate of Vitamin Energy customers after they try the product.

97.     IRI Worldwide numbers for 2021 Vitamin Energy sales also reflected this dramatic reversal from fast growth to declining sales, thus signaling industry participants to be cautious about placement of Vitamin Energy shots in their stores.

98.     Despite the introduction of new energy shots with new attributes desired by consumers in the years after 2020, Vitamin Energy sales in Pilot Flying J stores remain significantly below 2020 sales.

99.    These data confirm that the Pilot Flying J illegal anticompetitive agreement had the effect of both decreasing Vitamin Energy sales in the short run and depressing total sales over the long run.

100.   Vitamin Energy has repeatedly requested to have its energy shots restored to counter placement near cash registers, including as recently as multiple requests in 2024.

101.   On information and belief, Pilot Flying J's refusal to restore Vitamin Energy shots to prime selling locations on the counter near cash registers is a direct result of the illegal agreement between Defendants and Pilot Flying J.

**Defendants' Illegal Agreement Harmed Competition**

102.    On information and belief, other energy shots – not just Vitamin Energy's – that had been displayed at or near the POS point-of-sale in Pilot Flying J stores also suffered significant sales declines due to Defendants' anticompetitive and illegal exclusive placement agreement.

103.   Placement of energy shots on the counter at the point of sale is so important that Defendants' efforts in preventing that placement raises a significant barrier to entry to the energy shot market.  No competitor attempting to gain any significant market share in the energy shot market can do so without access to point of sale marketing placement.  This placement is the only efficient way for a new

competitor to develop the consumer trials and sales necessary to meaningfully compete.

104.   Another effect of Defendants' anticompetitive and illegal exclusive placement agreement was to reduce the energy shot choices available to consumers at Pilot Flying J store point-of-sale locations.

105.   For lower priced consumer goods about which consumers are unlikely to perform much if any pre-sale research, removing competitive products from preferred placement locations in which they can be readily compared with the dominant 5-hour ENERGY shot reduces the information available to consumers that shows there are alternative choices and that those alternatives may have different and more desirable attributes.

106.   Reducing the opportunity for consumers to directly compare products at the point-of-sale also increases the barriers to entry for competitors, who must increase marketing and advertising expenditures to access consumers who are potential customers.   For low-cost consumer purchases that are often impulse purchases, consumers likely pay even less attention to advertising that they do not encounter at the point-of-sale, further increasing the cost to competitors to obtain meaningful consideration of their energy shots.

107.   These negative effects on other competitors and consumers harmed competition in the market for energy shots.

## **Defendants' Illegal Agreement Harmed Vitamin Energy**

108.   A further effect of Defendants' anticompetitive and illegal exclusive placement agreement was to harm Vitamin Energy by removing its valuable sales racks, reducing sales of Vitamin Energy shots in Pilot Flying J stores, and reducing the visibility of Vitamin Energy's relatively new shots in a location that would itself advertise those shots to consumers, including consumers who might be encountering Vitamin Energy shots for the first time.

109.   By engineering the removal of Vitamin Energy shots from the preferred point-of-sale locations in Pilot Flying J stores, Defendants prevented Vitamin Energy from obtaining broader placement of Vitamin energy shots at more registers in the original 500+ stores and from expanding distribution to the Pilot Flying J stores which were not part of the original Vitamin Energy placement.

110.   By engineering the removal of Vitamin Energy shots from the key point-of-sale locations in Pilot Flying J stores, Defendants depressed Vitamin Energy sales and slowed the establishment of the brand awareness necessary for Vitamin Energy to obtain other similar product placements in other large retail chains.

111.   By engineering the removal of the less well-known Vitamin Energy shots from the counter space near the register in Pilot Flying J, Defendants precluded consumers from obtaining exposure to a competing product with different

attributes that may have better suited their preferences or allowed them to develop new preferences for energy shot attributes. This harmed both consumers of energy shots by removing information about and the availability of other choices than 5-hour ENERGY and Vitamin Energy by reducing exposure to potential new customers and increasing the costs of reaching those customers by alternate means.

**Defendant's Anticompetitive Placement Agreement with Casey's**

112. Casey's General Stores, Inc. operates gas stations and convenience stores in the midwestern United States. As of 2023, Casey's owned and operated more than 2,500 stores, and was the third largest convenience store chain in the United States.

113. In 2022 Defendants entered into an anticompetitive counter rack placement and rebate programs with Casey's.

114. On information and belief, the agreement was entered into between Living Essentials, LLC and Casey's General Stores, Inc., the corporate owner of Casey's convenience stores. It is presently unknown how and to what extent the other named Defendants participated in the inducement, making and/or execution of this agreement.

115. On information and belief, these agreements contained provisions similar to those in the Pilot Flying J anticompetitive placement agreement requiring Casey's convenience stores to provide and maintain dominant placement of 5-hour

ENERGY shots on the counter at the point of sale, require significant sales volumes in each convenience store, and paying rebates on the total 5-hour ENERGY with the understanding that Casey's would remove competing energy shots, including Vitamin Energy shots, from preferred counter placements near the cash register.

116.   On information and belief, these agreements increased the rebate amount or percentage to Casey's as convenience stores devoted more counter space exclusively to 5-hour ENERGY shots.

117.   On information and belief, due to this anticompetitive placement agreement, 5-hour ENERGY became the only energy shot displayed at the point-of-sale in Casey's convenience stores or at least significantly decreased the presence of any competing energy shots at the point-of-sale in Pilot Flying J stores.

118.   The implementation and maintenance of this agreement made it significantly more difficult for competing energy shots to obtain point-of-sale placement on the counters at or near the cash registers in Casey's stores.

119.   The agreement between Defendants and Casey's was an anticompetitive and illegal placement agreement.

## **Defendants' Illegal Casey's Agreement Harmed Competition**

120.   On information and belief, the anticompetitive placement agreement between Defendants and Casey's has prevented premium energy shot competitors

other than 5-hour Energy from obtaining product placement in Casey's 2,500 convenience stores.

121.   The anticompetitive placement agreement between Defendants and Casey's thus increased the barriers to entry for energy shot competitors in the same manner described above for the Pilot Flying J anticompetitive placement agreement.

122.   On information and belief, the anticompetitive placement agreement between Defendants and Casey's has prevented consumers from being offered and finding energy shots with attributes desired by consumers in Casey's 2,500 convenience stores.

123.   The anticompetitive placement agreement between Defendants and Casey's thus decreased consumer choice and reduced the availability of alternatives to Defendants' 5-hour ENERGY shots.

124.   These negative effects on other competitors and consumers harmed competition in the market for energy shots for the same reasons described in paragraphs 85 to 110 above.

### Defendants' Illegal Casey's Agreement Harmed Vitamin Energy

125.   Despite repeated efforts to do so, Vitamin Energy has been unable to obtain product point-of-sale placement in and distribution for its energy shots in Casey's convenience stores.

31

126.   Instead, Vitamin Energy was relegated to the Health & Beauty Aids section of Casey's, providing consumers with little exposure to the Vitamin Energy brand. This eventually caused Vitamin Energy shots to be cancelled from Casey's, as premium shots have never succeeded long-term in Casey's Health & Beauty Aids set. This is an area where value shots are sold and 5-hour ENERGY has additional significant distribution in (14 5-Hour ENERY SKUs in comparison to just 2 Vitamin Energy SKUs in Health & Beauty Aids).  5-hour ENERGY enjoys point-of-sale placement, driving an unfair advantage of awareness to its brand along with sales, while also enjoying a very large set of products in Health & Beauty Aids.

127.   On information and belief, the illegal exclusive placement agreement between Defendants and Casey's has prevented Vitamin Energy from obtaining product placement in Casey's 2,500 convenience stores.

128.   The Casey's anticompetitive agreement harmed Vitamin Energy by blocking its ability to place point-of-sale counter sales racks, blocking the overwhelming majority of Vitamin Energy shot sales in Casey's convenience stores, and blocking Vitamin Energy from displaying its shots in a location that would itself advertise those shots to consumers, including consumers who might be encountering Vitamin Energy shots for the first time.

129.   By blocking Vitamin Energy shots from placement in any of Casey's convenience stores at the point-of-sale on even a trial basis, Defendants prevented

Vitamin Energy from obtaining broader placement of Vitamin Energy shots in Casey's 2,500 stores.

130.    By blocking Vitamin Energy shots from sales at the point-of-sale in Casey's stores, Defendants depressed Vitamin Energy sales and slowed the establishment of the brand awareness necessary for Vitamin Energy to obtain other similar product placements in other large retail chains.

131.    By blocking Vitamin Energy shots from point-of-sale sales in Casey's stores Defendants precluded consumers from obtaining exposure to a competing product with different attributes that may have better suited their preferences or allowed them to develop new preferences for energy shot attributes.  This harmed both consumers of energy shots by removing information about and the availability of other choices than 5-hour ENERGY and Vitamin Energy by reducing exposure to potential new customers and increasing the costs of reaching those customers by alternate means.

132.    Because Casey's is the third largest convenience store operator in the United States, and because consumers frequently purchase energy shots at convenience stores, the anticompetitive placement agreement between Defendants and Casey's has prevented Vitamin Energy from obtaining the level of distribution and sales that it would have obtained, in Casey's and elsewhere, without the illegal agreement.

133.   With placement at a single register in each of approximately 500 Pilot Flying J convenience stores for just a couple months of 2020, Vitamin Energy 2020 sales in Pilot Flying J stores were over $225,000.  As noted above, Vitamin Energy shots generate at least 25 times higher sales volumes when placed in counter locations at the point-of-sale when compared with other locations, such as the Health & Beauty Aids set.  Vitamin Energy thus reasonably expects that its sales at even 500 of the Casey's convenience stores would have generated a minimum of $1,500,000 in sales each year but likely much higher.  Successful sales at 500 registers would likely have earned Vitamin Energy shot placement at 2,500 or more Casey's registers in the succeeding years, generating a minimum of $2,500,000 in sales in those years but again, likely much higher.

134.   Because placement at the counter point-of-sale location is shown to increase sales of Vitamin Energy shots by a factor of 25x or more, Vitamin Energy reasonably expects that its actual lost sales from the illegal exclusive placement agreement between Defendants and Casey's is a significant multiple of $2.5 million.

**Defendants' Other Illegal Anticompetitive Retailer Agreements**

135.   On  information  and  belief,  Defendants  have  entered  into anticompetitive placement agreements with many other retailers similar in type and effect to the Pilot Flying J and Casey's agreements described above.

136.   One recent example comes from the Huck's Market regional chain of approximately 130 convenience stores located in several states.  On November 18, 2024, a representative of Huck's Market who had requested and received samples of Vitamin Energy shots responded to a follow-up inquiry by stating that:

"I just revamped my energy shots and completed a new display with 5-hour. I have a contract with them for the next 2 years and not able to make changes currently.  After that, we may reevaluate!"

137.   On information and belief, these illegal agreements may cover 50% or more of all available top 100 convenience chain store point-of-sale locations in the United States, raising significant barriers to entry for competitors.

138.   On information and belief, Defendants also have exclusive placement agreements in place with other large non-convenience store retailers such as Dollar General, which operates over 25,000 stores.

139.   On information and belief, these other agreements operate to restrain and harm competition in the energy shot market, harm consumers at least by decreasing customer choice, and harm Vitamin Energy in the same manner described in detail above and below.

**<u>Defendants' Anticompetitive Agreements Have a Cumulative Effect</u>**

140.   The series of illegal anticompetitive placement agreements at Pilot Flying J, Casey's and other convenience store chains or retailers yet to be

discovered has a cumulative negative and anticompetitive effect on competition, on competitors, and on consumer choice.

141.   By systematically excluding competitors from the premium sales and consumer exposure locations in consumer's preferred location for purchasing energy shots, Defendants significantly increase the barriers to entry for new competitors and for growth opportunities for exiting competitors.  The effect of this systematic market exclusion is to reduce competition, discourage new market entrants, and maintain the monopoly position that Defendants enjoy in the premium energy shot market.

142.   This systematic exclusion of competitors has a profound and negative impact on the choices available to consumers at their preferred energy shot purchase location in convenience stores.  Despite the existence of energy shots with attributes that consumers identify as desirable, consumers have reduced or no exposure to those choices, thus are precluded from even considering meaningful alternatives to 5-hour ENERGY shots.

143.   This systematic exclusion of competitors also ensures that 5-hour ENERGY will continue to maintain a much higher market share and higher sales and profits than would be the case without the illegal agreements.

144.   Nor is the most recent series of agreements the only such agreements that Defendants have used to block competition and reduce consumer choice.  In

previous litigation between Living Essentials and a company called NVE, Inc., it became a matter of public record that Living Essentials entered into anticompetitive rack placement agreements with thousands of convenience stores that were alleged to have similar negative and anticompetitive effects. *Innovation Ventures, LLC v. NVE, Inc.*, 90 F. Supp 3d 703, 713 (E.D. Mich. Feb. 27, 2015). This rack program was referred to as the "STS Program." The STS Program may have been the model or a model on which the Pilot Flying J and Casey's rack programs are based.

### **Defendants' Historic False Advertising and Competitor Suppression**

145. Defendants have a long history of engaging in false advertisements about 5-hour ENERGY shots to deceive consumers. Several state Attorneys General have sued to stop the consumer deception in these false advertisements under various state laws, as follow:

a) In 2016, following a three-week trial, the Washington State Attorney General won a ruling that Living Essentials, LLC and Innovation Ventures, LLC violated the Washington State Consumer Protection Act by making deceptive claims in thousands of advertisements directed to consumers about 5-hour ENERGY that were not backed up by scientific evidence. The court later ordered the defendants to pay $4.3 million. The orders of the lower court were upheld by the Washington State Court of Appeals in 2019.

b)      In connection with the Washington enforcement action, a press release on the Attorney General's website stated that:

"The makers of 5-hour ENERGY® broke the law in pursuit of profit, and now they are paying for it," [Attorney General Bob] Ferguson said. … Judge Andrus also ordered the companies to pay nearly $2.1 million in costs and fees to Ferguson's office. The penalties and fees ordered Tuesday include more than $64,000 in sanctions against Living Essentials and Innovation Ventures for 'willful' discovery violations in the lead up to the September trial.  Andrus ruled that the defendants improperly 'cherry-picked' the documents produced to the Attorney General's Office, impeding the ability of the Attorney General's Office to prepare for trial."

https://www.atg.wa.gov/news/news-releases/ag-5-hour-energy-makers-ordered-pay-nearly-43-million-consumer-violations.

c)      In 2014, the state of Vermont also filed suit against Living Essentials, LLC and Innovation Ventures, LLC under the Vermont Consumer Protection Act based on similar claims of deceptive and misleading consumer advertising about the 5-hour ENERGY shot.

The Vermont case resolved in 2019 with the defendants paying a fine but admitting no liability.

     d)    Also in 2014, the state of Oregon filed suit against Living Essentials, LLC and Innovation Ventures, LLC under the Oregon Unlawful Trade Practices Act (UTPA) for misleading statements about 5-hour ENERGY shots in print, television, Internet and radio advertising.  In 2023, the state of Oregon won an appeal to the Oregon Supreme Court overturning earlier losses at the trial and intermediate appellate courts.

146.   In multiple lawsuits, Courts in this judicial district have needed to reign in the Defendants for their overreaching and anticompetitive conduct:

     a.   In *Innovation Ventures d/b/a Living Essentials v. Body Marketing Int'l*, 2:08-cv-12711, 2008 U.S. Dist. LEXIS 116678, (E.D. Mich. Oct. 28, 2008), Magistrate Judge Pepe issued a Report and Recommendation dated October 28, 2008 in favor of defendant BDI Marketing recommending that a preliminary injunction should be issued to stop false advertising by Innovation Ventures. Innovation Ventures had created an advertisement falsely suggesting that all energy shots with "6 Hours" on their label had been enjoined by Judge Borman in an earlier decision.  Judge Rosen accepted MJ Pepe's recommendation

and enjoined Innovation Ventures against false advertising that suggested that BDI Marketing's energy shot had been enjoined. *Innovation Ventures d/b/a Living Essentials v. Body Marketing Int'l*, 2:08-cv-12711, 2009 WL 877640 (E.D. Mich. Mar. 30, 2009).

b. In *International IP Holdings v. Green Planet, Inc.*, No. 13-13988, 2016 WL 1242275 at *8 (E.D. Mich. Mar. 30, 2016), Judge Cleland wrote that International IPH and Innovation Ventures "present a wildly inflated view of what uses their trademarks protect against."  Judge Cleland wrote: International IPH and Innovation Ventures "complain of Defendant's use of the 'number-hour-synonym for energy' naming format – as Plaintiffs dub it – but their trademarks do not protect that naming scheme."  "The court rejects the implication that 5-hour ENERGY has the exclusive right to use time units and synonyms for energy in naming an energy shot."  "Any other conclusion would severely and unfairly limit all competitors in the energy-shot market."  *Id.*

147.   Over the period from 2021 to 2024, industry data shows that the total energy shot market was about $3.5 billion in retail sales.  At a 90% market share, 5-Hour Energy shots are believed to have total retail sales of approximately $3.2 billion.  At an average retail price of $3/shot, approximately 1.0 billion 5-hour

ENERGY shots were sold during that period. A conservative estimate of Defendants' profits is $1/shot, or $1.0 billion over the years from 2021 to 2024.

148. In 2024, industry forecasts project the total energy shot market at $850 million in total retail sales. Using the same approach described above, Defendants' 2024 profits from 5-hour ENERGY sales are estimated to be $255 million.

149. Defendants' profits must be disgorged to Vitamin Energy due to 5 hour-ENERGY's false advertising.

## Defendants' Serial False Advertisements

150. Consumer product marketing relies on a variety of types of advertising to attract consumer interest and encourage purchases.

151. Consumer marketing often utilizes different advertisements in parallel, in series, or both that seek to influence consumer purchasing decisions at different points along what is often referred to as the "consumer journey."

152. The consumer journey may include the time when a consumer first becomes aware of a new and unfamiliar product or product category, and at various later times when the customer has encountered the product in the market or personally used the product. Part of the consumer advertising is directed towards the attributes of the offered product and/or the results that the consumer might expect to achieve using the product.

153.   As an example, when first launched, 5-hour ENERGY was called chaser 5-hour ENERGY and explicitly stated on the label "5 hours of energy now." Defendants later dropped the name "chaser", called the product 5-hour ENERGY, and modified the statement on the label to "Hours of energy."

 

154.   The 5-hour ENERGY product name is both a brand and a statement of one of the positive attributes claimed for the product.  As noted above, the Attorney Generals of at least three different states—Washington, Oregon and Vermont—objected to this claimed attribute of the product under various state law consumer protection and deceptive advertising statutes.

155.   Recognizing and utilizing this consumer journey, companies often create advertisements that build on earlier advertisements or campaigns addressing product attributes or results.  In doing so, the advertiser creates a cumulative stock of representations about the product in the mind of the consumer such that when

consumers encounter later advertisements they recall those earlier representations or the message those representations were intended to convey.

156.   Defendants have advertised the 5-hour ENERGY shot in ways that create false consumer impressions of the product, its attributes, and the results consumers expect to obtain from consuming those shots.

### Defendants' False 100% Energy Ads

157.   Beginning   in   2019   and   lasting   through   the   present https://www.youtube.com/results?search_query=5+hour+energy+ , Defendants ran a series of ads on television, YouTube and TV which state that consuming 5-hour ENERGY shots will "recharge your batteries, all the way back to 100%, fast." (the "100% Energy Ads").

158.   A screenshot example of one of the 100% Energy Ads that ran on television, YouTube and other media is shown below:



159.   The 100% Energy Ads show people engaged in everyday activities, like walking down the street, with energy shot bottle shaped "energy meters" over their heads showing various levels of energy below 100%.  In the example above, the people are shown with depleted energy levels ranging from 12% to 46%.  None of the individuals for whom energy meters are shown are smiling or appear to be happy.

160.   By contrast, after consuming 5-hour ENERGY, the consumers are shown with energy meters registering 100%.













161.   By quantifying the level of depleted energy with energy meters showing 23% to 41% energy levels, Defendants make affirmative factual representations about the depicted consumers' low energy levels before consuming 5-hour ENERGY.

162. By then showing and contrasting those same consumers after consuming 5-hour ENERGY with energy meters "restored" to 100%, Defendants make affirmative factual representations about the depicted consumers' full energy levels.

163. The related statement that consuming 5-hour ENERGY shots will "recharge your batteries, all the way back to 100%, fast" is a further affirmative factual representation about the quantifiable effects of using 5-hour ENERGY.

164. The statement that 5-hour ENERGY users will get all the way back to 100% energy by consuming a 5-hour ENERGY shot is literally false and/or deceptively misleading.

165. The Get Back to 100% Energy Ad Campaign has a tendency to deceive a substantial portion of the intended audience into believing that they can regain their full 100% energy simply by consuming a 5-hour ENERGY shot.

166. The Get Back to 100% Energy Ad Campaign actually deceived or tended to deceive a substantial portion of the intended audience.

167. The statement that 5-hour ENERGY users will get back to 100% energy by consuming a 5-hour ENERGY shot likely influences consumer purchasing decisions.

168. The statement that 5-hour ENERGY users will get back to 100% energy by consuming a 5-hour ENERGY shot is false and misleading for an

additional reason.   That statement is intended to leave, and does leave, the false and/or misleading impression that, 5-hour ENERGY shots are superior to other energy shots on the market, including Vitamin Energy's VITAMIN ENERGY® brand energy shots.

### Defendants' False Fixes Tired Fast Ads

169.   In another ad campaign beginning in late 2023 or early 2024, Defendants state on the product website that a 5-hour ENERGY shot "Fixes Tired Fast" (the "Fixes Tired Fast Ads").





170.   5-Hour Energy has recently begun to include the phrase "Fixes Tired Fast" on the bottles of the energy shots it sells in Q4 2023, as shown in the picture below, taken from the 5-Hour Energy website on October 14, 2024:



171.   For many consumers exposed to Defendants' advertising over time, The "Fixes Tired Fast" statement is a later stop on the consumer journey that includes the 100% Energy Ads.

172.   "Fixes Tired Fast" is a continuation of the advertising message that 5-hour ENERGY shots will "recharge your batteries, all the way back to 100%, fast".

173.   On information and belief, a significant number of consumers who buy 5-hour ENERGY with "Fixes Tired Fast" on the label were also exposed to the

100% Energy Ads. Defendants virtually guarantee this to be the case by placing the false "Fixes Tired Fast" message on each bottle of 5-hour ENERGY.

174. The Fixes Tired Fast statement thus builds on the earlier 100% Energy Ads falsely advertising specific product attributes or results. In doing so, the Defendants use the Fixes Tired Fast statement to those earlier representations or the message those representations were intended to convey that consuming 5-hour ENERGY will get a user back to 100% energy levels.

175. Standing alone, the statement that a 5-hour ENERGY shot "Fixes Tired Fast" is literally false and/or deceptively misleading.

176. In combination with the earlier false 100% Energy Ads, the statement that a 5-hour ENERGY shot "Fixes Tired Fast" is literally false and/or deceptively misleading.

177. Standing alone, the Fixes Tired Fast Ads have a tendency to deceive a substantial portion of the intended audience.

178. In combination with the earlier false 100% Energy Ads, the statement that a 5-hour ENERGY shot "Fixes Tired Fast" has a tendency to deceive a substantial portion of the intended audience.

179. Standing alone, the statement that a 5-hour ENERGY shot "Fixes Tired Fast" likely influences consumer purchasing decisions.

180.   In combination with the earlier false 100% Energy Ads, the statement that a 5-hour ENERGY shot "Fixes Tired Fast" likely influences consumer purchasing decisions.

181.   Standing alone, the statements that a 5-hour ENERGY shot "Fixes Tired Fast" is intended to leave, and does leave, the false and/or misleading impression that, among other things, Defendants' 5-hour ENERGY shots are superior to other energy shots on the market, including Vitamin Energy's VITAMIN ENERGY® brand energy shots.

182.   In combination with the earlier false 100% Energy Ads, the statement that a 5-hour ENERGY shot "Fixes Tired Fast" is intended to leave, and does leave, the false and/or misleading impression that, among other things, Defendants' 5-hour ENERGY shots are superior to other energy shots on the market, including Vitamin Energy's VITAMIN ENERGY® brand energy shots.

183.   Standing alone, the statements that a 5-hour ENERGY shot "Fixes Tired Fast" is intended to leave, and does leave, the false and/or misleading impression that, among other things, Defendants' 5-hour ENERGY shots will always provide a complete cure to tiredness.

184.   In combination with the earlier false 100% Energy Ads, the statement that a 5-hour ENERGY shot "Fixes Tired Fast" the statements that a 5-hour ENERGY shot "Fixes Tired Fast" is intended to leave, and does leave, the false

and/or misleading impression that, among other things, Defendants' 5-hour ENERGY shots will always provide a complete cure to tiredness.

185.   Defendants' 5-hour ENERGY shots will not always end a consumer's feeling of being tired.

186.   Consumers that wish to purchase energy shots are misled to believe that 5-hour ENERGY is a superior energy shot to Vitamin Energy's.

187.   Consumers that wish to purchase energy shots are misled to believe that 5-hour ENERGY shot consumers will receive five hours of energy, no matter how tired they are and regardless of any other relevant circumstances.

188.   Consumers that wish to purchase energy shots are misled to believe that a 5-hour ENERGY shot will "fix[] tired fast" for them.

189.   There is no clear and conspicuous disclaimer on the front of a 5 Hour Energy bottle that would notify consumers that "Individual results may vary."

190.   The addition of "Fixes Tired Fast" to the 5 Hour Energy bottle leaves the false impression with consumers that 5 Hour Energy definitively provides 5 Hours of Energy and will Fix Tired Fast, with no results varying.

191.   5 Hour Energy purposely used the very inconspicuous and indistinct disclaimer "Individual results may vary" in 2 pt font that is barely legible with a magnifying glass on the back of the bottle.  A consumers considering an energy shot is unlikely to read this disclaimer before purchasing a shot:



192.  This contrasts with Vitamin Energy's advertising of its energy benefit that provides "up to 7+ hours of energy." Caffeine, the main ingredient in both 5 Hour Energy and Vitamin Energy, affects people's energy differently due to differences in weight, age, sleep, caffeine dependency, genetics, and more.

**Defendants' False Advertising Harms Vitamin Energy**

193.  Defendants' false advertisements, individually and collectively, misrepresent the benefits of 5-hour ENERGY shots in ways that mislead consumers to believe that those shots are superior to Vitamin Energy shots, when in fact the opposite is true.

194.  By misleading and deceiving consumers that 5-hour Energy shots have attributes and benefits that they do not have, Defendants trick consumers into buying 5-hour Energy shots in lieu of Vitamin Energy shots.  This deception has

the effect of diverting energy shot consumers who would prefer Vitamin Energy and its attributes and benefits to instead buy 5-hour Energy shots.

195.   By misleading and deceiving consumers that 5-hour Energy shots have attributes and benefits that they do not have, Defendants dissuade consumers who have tried and do not like 5-hour Energy shots from trying other energy shots, such as Vitamin Energy, which has attributes and benefits that industry marketing data suggests that energy shot consumers want.

196.   Defendants ubiquitous market presence, obtained and sustained through successive waves of false advertising, drowns out the truthful information available to consumers about energy shots such as Vitamin Energy in a manner that suppresses consumer demand for Vitamin Energy products and so negatively impacts sales of Vitamin Energy shots.

197.   Although it is difficult at this point to accurately estimate the specific damages to Vitamin Energy from Defendants' false advertising, Vitamin Energy believes that those damages are in the millions of dollars of lost sales.

198.   The damages to Vitamin Energy in the form of sales lost due to Defendants' false advertising are distinct from and in addition to the damages to Vitamin Energy from Defendants' violations of antitrust law described above.

## COUNT I

### Violation of Sherman Act—Monopolization

199.   Vitamin Energy repeats and realleges each and every allegation of Paragraphs 20 through 40 above and 68 through 144 above as if set forth fully herein.

200.   This is a civil action under Section 2 of the Sherman Act, 15 U.S.C. § 2, for actual damages, treble damages, the costs of suit, and a reasonable attorney's fee pursuant to 15 U.S.C. § 4304.

201.   Upon information and belief, each Defendant, individually and in concert with one or more of the other Defendants, has monopolized a part of the trade or commerce among the several states.  Upon information and belief, each Defendant, individually and in concert with one or more of the other Defendants, possesses a monopoly power in the relevant market and has engaged in the willful acquisition or maintenance of that power.

202.   Defendants and Vitamin Energy are direct competitors in the distribution and sale of energy shots within the United States and utilize the identical or similar channels of distribution of their products.

203.   No later than 2008, as Defendant Innovation Ventures alleged in court filings against other energy shot competitors and as Vitamin Energy believes,

Defendant Innovation Ventures controlled 90% or more of the market for all 2-ounce energy shots sold in the United States.

204.   At least by 2012, as Defendant Bhargava stated in an interview, Defendant Innovation Ventures controlled 93% or more of the market for all 2-ounce energy shots sold in the United States.

205.   Since that time, there have been multiple changes in corporate entities engaged in the marketing, distribution and sale of 5-hour Energy shots, and it is unclear exactly which role or roles each named Defendant occupies in the current structure, but Defendants are under common control and direction in the enterprise of marketing, distributing and selling 5-hour Energy shots.

206.   At all times relevant to this complaint, Defendants controlled 90% or more of the market for all 2-ounce energy shots sold in the United States.

207.   Defendants' control of 90% or more of the entire energy shot market, or 95% or more of the premium energy shot category of the larger market at all times relevant to this complaint constitutes a monopoly.

208.   The premium price segment of the energy shot market in which 2-ounce energy shots sell at retail prices of approximately $3.00 or more is a relevant submarket of the larger 2-ounce energy shot market.

209.   2-ounce energy shots command a substantial price premium over other energy drink products sold in other sizes, such as 12-ounce Monster Energy drinks,

at least in part because larger sizes are sold and consumed as beverages, and products in the 2-ounce energy shot market are not sold and consumed as beverages.

210.    Energy drinks sold as beverages, although six times the volume of 2-ounce energy shots, often sell at retail for less than $2/drink.  On a per ounce basis, energy shots in the premium price segment submarket sell for approximately $1.50/ounce, while energy drinks sold in 12-ounce sizes sell for approximately $0.17/ounce or less.  Premium price energy shots thus sell for retail prices ten times higher than full size energy drinks on a per ounce basis.

211.    On information and belief, at all times relevant to this complaint, Defendants have individually or collectively controlled 95% or more of the premium price submarket of the larger 2-ounce energy shot market.

212.    Defendants' control of 95% or more the premium price segment of the energy shot market at all times relevant to this complaint constitutes a monopoly of that submarket.

213.    The market for 2-ounce energy shots constitutes a relevant economic market for purposes of antitrust analysis.

214.    The market for premium price 2-ounce energy shots constitutes a relevant economic submarket for purposes of antitrust analysis.

215.    The United States of America constitutes a relevant geographic market for purposes of antitrust analysis.

216.   By virtue of its 90% plus market share, at all times relevant to this complaint Defendants possessed market power in the 2-ounce energy shot market.

217.   By virtue of its 95% plus market share, at all times relevant to this complaint Defendants possessed market power in the premium price submarket for 2-ounce energy shots.

218.   On information and belief, Defendants sales in the 2-ounce energy shot market exceed $250 million per year.

219.   As described in detail above, Defendants have entered into a variety of anticompetitive agreements and taken various actions and steps to illegally prevent Vitamin Energy and other competitors from competing effectively with Defendants' lucrative monopoly in the 2-ounce energy shot market.

220.   As described in detail above, Defendants have entered into a variety of anticompetitive agreements and taken various actions and steps to illegally prevent Vitamin Energy and other competitors from competing effectively with Defendants' lucrative monopoly in the submarket for premium price shots within the larger 2-ounce energy shot market.

221.   Defendants have engaged in illegal anti-competitive conduct to stifle and restrict competition, to increase the costs to competitors of entry and participation, and to obtain and maintain their dominant and monopoly market

power in the 2-ounce energy shot market and in the submarket for premium price shots.

222. On information and belief, Defendant's illegal anti-competitive conduct was intended to and has had the effect of restricting entry into the relevant U.S. market and submarket and protecting Defendants' dominant share of the relevant market and submarket from competition by numerous competitors.

223. Defendants' illegal anti-competitive conduct has had and continues to have significant negative effects for consumers of energy shots by restricting and precluding the availability of multiple alternate energy shot choices with attributes favored by consumers.

224. On information and belief, Defendants' conduct and actions are not justified by any countervailing efficiencies or legitimate business reasons.

225. These anti-competitive measures have proximately caused Vitamin Energy to sustain damages, including lost profits and litigation expenses.

226. On information and belief, in addition to harming actual and current competitors such as Vitamin Energy, Defendants have also harmed competition in the relevant to the 2-ounce energy shot market and in the submarket for premium price shots in a manner offensive to and prohibited by the Sherman Anti-Trust Act, 15 U.S.C. § 1, et seq.

227. Vitamin Energy is entitled to judgment against each and every Defendant for actual damages, treble damages, attorneys' fees, costs, and all other relief available for violation of the Sherman Anti-Trust Act, 15 U.S.C. § 1, et seq. including costs and a reasonable attorney's fee under 15 U.S.C. § 4304.

## COUNT II

### Violation of Sherman Act—Attempted Monopolization

228. Vitamin Energy repeats and realleges each and every allegation of Paragraphs 20 through 40 above, 68 through 144 above, and 199 through 227 above as if set forth fully herein.

229. This is a civil action under Section 2 of the Sherman Act, 15 U.S.C. § 2, for actual damages, treble damages, the costs of suit, and a reasonable attorney's fee pursuant to 15 U.S.C. § 4304.

230. By virtue of its large nationwide market share in the 2-ounce energy shot market and in the submarket for premium price shots and its illegal anti-competitive conduct, each Defendant, individually and in concert with one or more of the other Defendants, has the ability to attempt to control the 2-ounce energy shot market and in the submarket for premium price shots in the United States.

231. Defendants' actions demonstrate a specific intent to monopolize and/or to restrict and destroy competition in the 2-ounce energy shot market and in the submarket for premium price shots in the United States.

232.   Defendants have willfully engaged in a course of predatory and/or exclusionary conduct to obtain a monopoly in the 2-ounce energy shot market and in the submarket for premium price shots in the United States.

233.   Defendants' illegal course of anticompetitive conduct and each action in furtherance thereof was taken for the purpose of obtaining a monopoly in the relevant economic market and submarket, each in the geographic market described above.

234.   Unless restrained and prevented by this Court, Defendants' illegal course of anticompetitive conduct and each action in furtherance thereof has a dangerous probability of succeeding in obtaining a monopoly in the relevant economic market and submarket each in the geographic market described above.

235.   Because Defendants' clearly exclusionary conduct, lacking any legitimate business purpose, along with the exclusionary intent that can be inferred from such conduct, poses such a danger to competition, it may be condemned even without a showing of a dangerous probability of success.

236.   If Defendants succeed in obtaining a monopoly in the relevant economic market and submarket each in the geographic market described above, these acts will harm and restrain competition and cause antitrust injury in those markets in a manner prohibited by the Sherman Act.

237.   As described at length above, Vitamin Energy has been harmed and damaged by the illegal and anti-competitive conduct of the Defendants.

238.   Vitamin Energy is entitled to judgment against each and every Defendant for actual damages, treble damages, attorneys' fees, costs, and all other relief available for violation of the Sherman Anti-Trust Act, 15 U.S.C. § 1, et seq. and under 15 U.S.C. § 4304.

## COUNT III

## False Adverting under 15 U.S.C. § 1125(a)(1)(B)

239.   Vitamin Energy repeats and realleges each and every allegation of Paragraphs 6 through 67 above, and 145 through 198 above as if set forth fully herein.

240.   This is a civil action arising under Section 43(a) of the Trademark Act of 1946 as amended, 15 U.S.C. § 1125(a), for false and misleading description of facts as to the nature, characteristics, and qualities of Defendants 5-hour Energy shot products as those products are falsely advertised to consumers.

241.   Defendants' 100% Energy Ads and Fixes Tired Fast Ads, each alone and in combination with one another contain false and misleading statements of fact about the attributes or benefits of 5-hour Energy shots.

242.   Defendants' activities are likely to create confusion among the purchasing public, are likely to deceive purchasers about the qualities of

Defendants' goods and are likely to otherwise mislead and deceive consumers about the relative attributes and benefits of 5-hour Energy shots versus other energy shots in the market.

243.   Defendants' placement of false and misleading commercial advertising in commerce has deceived and continues to deceive a substantial portion of the intended audience about the nature, characteristics or qualities of Defendants' goods.

244.   Defendants' placement of false and misleading commercial advertising in commerce has deceived and continues to deceive a substantial portion of the intended audience about the relative merits of the nature, characteristics or qualities of Defendants' goods as compared with the nature, characteristics or qualities of competing energy shots.

245.   Defendants' false and misleading commercial advertising in commerce was done in bad faith and with the willful intent to deceive a substantial portion of their intended audience.

246.   Defendants' false and misleading commercial advertising in commerce will continue unless restrained and enjoined by this Court.

247.   Defendants' false and misleading commercial advertising in commerce has directly and proximately caused and will continue to cause irreparable and

economic injury to Vitamin Energy, including loss of good will, reputational harm, loss of business, loss of sales, loss of revenues, and loss of profits.

248. Vitamin Energy is entitled to recover disgorgement of Defendant's profits of $1 billion or more, Vitamin Energy's damages, the costs of this action and an award of three times the sum of actual damages, all as compensation, and a finding that this is an exceptional case and that Vitamin Energy may recover its reasonable attorney fees, all as provided in 15 U.S.C. § 1117(a).

249. Vitamin Energy is also entitled to equitable relief, including preliminary and permanent injunctive relief as provided in 15 U.S.C. § 1116(a).

250. Vitamin Energy is entitled to have 5-Hour Energy's false and misleading commercial advertising and all products displaying the false and misleading advertising delivered up and destroyed as provided in 15 U.S.C. § 1118.

251. Vitamin Energy is further entitled to corrective advertising to remedy the false and misleading impressions created by Defendants' false advertising, including but not limited to additional monetary relief from Defendants so that Vitamin Energy can develop and run corrective advertising.

## COUNT IV

## Civil Conspiracy

252. Vitamin Energy repeats and realleges each and every relevant allegation of Paragraphs 1 through 251 above as if set forth fully herein.

253.   Two or more of Defendants Bhargava, Living Essentials, International IPH, and Innovation Ventures engaged in concerted action to attempt to establish and to establish an illegal monopoly in violation of the Sherman Act as described in Counts I and II above and the other paragraphs referenced therein.

254.   Two or more of the Defendants combined their efforts to obtain and to cement and maintain the dominant market position of 5-hour ENERGY shots in the relevant economic market and submarket each in the geographic market of the United States.

255.   These acts constitute a conspiracy to achieve and maintain an illegal monopoly.

256.   Two or more of Defendants Bhargava, Living Essentials, International IPH, and Innovation Ventures engaged in concerted action to falsely advertise the 5-hour ENERGY products as alleged in Count III above.

257.   Two or more of the Defendants combined their efforts to engage in false advertising as alleged in Count III above and the other paragraphs referenced therein.

258.   These acts constitute a conspiracy to engage in false advertising.

259.   As to each the monopolization conspiracy and the false advertising conspiracy, two or more of Defendants engaged in a number of overt acts and used unlawful means in their attempts to do so.

260.   As to each the monopolization conspiracy and the false advertising conspiracy, each of the Defendants engaged in the conspiracy is liable for each of the acts committed by the other Defendants similarly engaged and for the illegal results of the conspiracy.

261.   As to each the monopolization conspiracy and the false advertising conspiracy, Defendants' acts in furtherance of this conspiracy have proximately caused Vitamin Energy to sustain damages.

262.   These damages include, but are not limited to, lost profits and litigation expenses.

263.   Defendants engaged in this illegal course of conduct with reckless disregard for Vitamin Energy's rights.

264.   Defendants engaged in this illegal course of conduct with the intention of violating Vitamin Energy's rights.

265.   Vitamin Energy is entitled to judgment against Bhargava, Living Essentials, International IPH, and Innovation Ventures for actual damages, punitive damages, and the costs of this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Vitamin Energy prays for judgment against Bhargava, Living Essentials, International IPH, and Innovation Ventures as follows:

A.     A determination for Vitamin Energy and against Bhargava, Living Essentials, International IPH, and Innovation Ventures on Vitamin Energy's complaint in this case;

B.     A determination that Bhargava, Living Essentials, International IPH, and Innovation Ventures have engaged in an illegal monopoly in violation of the Sherman Act, 15 U.S.C. § 1, *et seq.*;

C.     A determination that Bhargava, Living Essentials, International IPH, and Innovation Ventures have engaged in an illegal attempt to create a monopoly in violation of the Sherman Act, 15 U.S.C. § 1, *et seq.*;

D.     All relief against Bhargava, Living Essentials, International IPH, and Innovation Ventures available under the Sherman Act, 15 U.S.C. § 1, *et seq.* including actual and treble damages and costs and reasonable attorney's fees under 15 U.S.C. § 4304;

E.     A determination that Bhargava, Living Essentials, International IPH, and Innovation Ventures have violated the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), that their violations were willful, that Vitamin Energy has been damaged by such violations, and that Bhargava, Living Essentials, International IPH, and Innovation Ventures are liable to Vitamin Energy for such violations;

F.     An award of disgorgement of Defendants' profits, Vitamin Energy's damages and the costs of the action under 15 U.S.C § 1117(a);

G.     An award trebling actual damages or Defendants' profits from violation of the Lanham Act, and a finding that this is an exceptional case and awarding Vitamin Energy's attorneys' fees, pursuant to 15 U.S.C. § 1117;

H.     Destruction of the false advertising and all products that bear the false advertising, as well as the means to make labels bearing the false advertising;

I.     An award of an additional monetary amount sufficient to allow Vitamin Energy to develop and run corrective advertising;

J.     Actual and punitive damages;

K.     An award of Vitamin Energy's taxable costs of this civil action, including interest;

L.     A preliminary and permanent injunction that enjoins Defendants, their officers, employees, agents, successors and assignees, and all those in active concert and participation with them, and each of them who receives notice directly or otherwise of such injunctions, from false advertising;

M.     An award of such other relief as the Court deems just and proper.


## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

EVIA LAW PLC

/s/ Steven Susser
Steven Susser (P52940)
Jessica Fleetham (P81038)
Evia Law PLC
32400 Telegraph Suite 103
Bingham Farms, MI 48025
248-243-1201
steven@evialaw.com
jessica@evialaw.com