# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

VITAMIN ENERGY, INC.,

     Plaintiff,

v.

MANOJ BHARGAVA, et al.,

     Defendants.

_____/

Case No. 24-13125
Hon. Jonathan J.C. Grey

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS (ECF No. 19)

On November 22, 2024, Vitamin Energy, Inc. ("Vitamin Energy") filed a civil complaint against Defendants Manoj Bhargava, Living Essentials, L.L.C. ("Living Essentials"), International IP Holdings, LLC ("International IP"), and Innovation Ventures, LLC ("Innovation Ventures") (collectively, "Defendants"). (ECF No. 1.) Vitamin Energy alleges that Defendants maintain a monopoly in the energy shot market in violation of the Sherman Anti-Trust Act (the "Sherman Act"), 15 U.S.C. § 1, et seq. (*Id.*) Vitamin Energy also alleges that Defendants have commissioned false advertising in violation of the Trademark Act, 15

U.S.C. § 1125(a)(1)(B), and committed civil conspiracy to maintain their monopoly. (*Id.*)

On February 10, 2025, Defendants filed a motion to dismiss. (ECF No. 19.) The motion is fully briefed. (ECF Nos. 20, 27.) The Court finds that the parties have adequately briefed the motion and therefore considers it without oral argument. E.D. Mich. LR 7.1(f). For the reasons set forth below, the Court **GRANTS** the motion.

## I.    BACKGROUND

Defendants allegedly "work together to promote and market 5-Hour ENERGY products." (ECF No. 1, PageID.6.) 5-Hour ENERGY products allegedly maintain a monopoly in the energy shot market. (*Id.* at PageID.7–9, 17.) Vitamin Energy alleges that Defendants use "aggressive litigation tactics" to "restrict and impair competition in the energy shot market[.]" (*Id.* at PageID.15.) Vitamin Energy further alleges that Defendants entered into anticompetitive contracts with Pilot Flying J ("Pilot") gas stations, Casey's General Stores ("Casey's"), Huck's Market ("Huck's") convenience stores, Dollar General, and other unnamed convenience stores. (*Id.* at PageID.23–37.) Vitamin Energy only offers additional details for three of Defendants' allegedly anticompetitive

contracts: the Pilot contract, the Casey's contract, and the Huck's contract. (*Id.*)

In 2020, Vitamin Energy allegedly entered into their own contract with Pilot to "to place Vitamin Energy retail display racks on the counter near the cash register" at over 500 Pilot convenience stores. (*Id.* at PageID.20.) Allegedly, after learning about this contract, Defendants induced Pilot to "remove the Vitamin Energy racks along with other Vitamin Energy products from the point-of-sale locations and place the Vitamin Energy shots in a secondary more obscure location, while 5-hour ENERGY shots retained their placement on the counter at the point-of-sale." (*Id.* at PageID.23.) Further, Defendants allegedly entered into their own contract with Pilot to "obtain and maintain dominant placement of 5-hour ENERGY shots on the counter at the point of sale, . . . with the understanding that Pilot would remove competing energy shots, including Vitamin Energy shots, from preferred counter placements near the cash register." (*Id.*) Defendants allegedly incentivized Pilot "to devote most or all energy shot counter space to 5-hour ENERGY shots" by paying Pilot "millions of dollars in rebates under th[e] agreement." (*Id.* at PageID.24.) Vitamin Energy shots were allegedly removed from the

counter location, placed in a less prominent location, and resulted in decreased Vitamin Energy sales. (ECF No. 1, PageID.25–26.)

Vitamin Energy alleges that Defendants entered into a similar "anticompetitive counter rack placement and rebate program" with Casey's. (*Id.* at PageID.29–31.) Vitamin Energy claims that Defendant's agreement with Casey's has blocked Vitamin Energy from "obtain[ing] product point-of-sale placement in and distribution for its energy shots in Casey's convenience stores." (*Id.* at PageID.31–34.)

Vitamin Energy alleges that on November 18, 2024, a representative of Huck's stated that it "completed a new display with 5-hour" as a part of a 2-year contract and, therefore, Huck's was "not able to make changes[.]" (*Id.* at PageID.35.) The complaint does not offer context as to what the email was addressing, nor does Vitamin Energy offer clarity. (*Id.*) However, Vitamin Energy does allege that Huck's was similarly in an "exclusive placement agreement[]" with the Defendants. (*Id.*)

Lastly, Vitamin Energy alleges that Defendants engaged in false advertising through their Get Back to 100% Energy advertisements (the

4

"Get Back to 100% Energy Ads") and the use of their "Fixes Tired Fast®" trademark in advertisements. (ECF No. 1, PageID.43–55.)

The Get Back to 100% Energy Ads allegedly began running in 2019 and featured the statement that "consuming 5-hour ENERGY shots will 'recharge your batteries, all the way back to 100%, fast.'" (*Id.* at PageID.43.) The advertisements also featured actors with floating energy meters above their heads that denoted varying energy level percentages. (*Id.* at PageID.44–47.) A screenshot of the advertisement is provided below:



(*Id.* at PageID.44.)

The "Fixes Tired Fast" trademark allegedly appears on Defendants' website and on their 5-hour ENERGY products, as shown below:







## II.    LEGAL STANDARD

Under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 556) "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, [or] a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

Courts usually consider only the allegations in the complaint. *Rondigo, LLC v. Twp. of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011) (citations omitted). However, courts may also rely on "exhibits attached to the complaint, public records, items appearing in the record of the case[,] and exhibits attached to defendant's motion to dismiss"—but only if the complaint relies on them—without having to convert the motion to

dismiss to a motion for summary judgment. *Id.* at 680–681 (citing *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008)).

## III. ANALYSIS

### A. Antitrust Claims

The Sherman Act makes it illegal "to monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States[.]" 15 U.S.C. § 2. However, on its own, "possessing monopoly power and charging monopoly prices do[es] not violate [the Sherman Act]." *St. Luke's Hosp. v. ProMedica Health Sys.*, 8 F.4th 479, 486 (6th Cir. 2021) (internal quotation marks omitted) (quoting *Pac. Bell Tel. Co. v. linkLine Commc'ns., Inc.*, 555 U.S. 438, 447–448 (2009).

Specifically, the Sherman Act prohibits "the possession of monopoly power coupled with the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.* (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–571 (1966)). Therefore, a monopoly prohibited under the Sherman Act must "harm the competitive *process* and thereby harm consumers, as mere harm to one

or more *competitors* will not suffice." *Id.* (emphasis in original) (internal quotation marks omitted) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001)).

### i. Monopoly Claim (Count I)

Vitamin Energy claims that Defendants, individually and in concert with one or more of the other defendants, have willfully acquired and maintained a monopoly of the energy shot market. (ECF No. 1, PageID.56.) Vitamin Energy further alleges that "Defendants have entered into a variety of anticompetitive agreements and taken various actions and steps to illegally prevent Vitamin Energy and other competitors from competing effectively with Defendants' lucrative monopoly in the 2-ounce energy shot market." (*Id.* at PageID.59.)

Defendants argue that Vitamin Energy does not have antitrust standing because it has not shown a market-wide injury to competition. (ECF No. 19, PageID.413–418.) Defendants further counter that Vitamin Energy knew that Pilot was not giving 5-hour ENERGY products preferred product placement at the time that it filed its complaint. (*Id.* at PageID.416–417.) Defendants lastly argue that they are not responsible for the removal of Vitamin Energy's display racks and, if any harm has

9

resulted from their agreements with Pilot and similar convenience stores, Vitamin Energy has only pleaded personal harm and not harm to the market. (ECF No. 19, PageID.417–418.)

"[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement,' courts must dismiss it as a matter of law." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007). "[S]tanding in an antitrust case is more onerous than the conventional Article III inquiry." *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 402 (6th Cir. 2012). There are five factors that district courts balance when determining whether a claimant has adequately pleaded antitrust standing:

> (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

*Id.* (quoting *Southaven Land Co., Inc. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir. 1983)).

An antitrust claimant bears the burden of making more than "allegations of consequential harm resulting from a violation of the antitrust laws," which is true even when the complaint is "buttressed by an allegation of intent to harm the [claimant]." *NicSand*, 507 F.3d at 449 (internal quotation marks omitted) (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 545 (1983)). "Unless an antitrust plaintiff alleges an injury that arises from 'an anticompetitive aspect of the practice under scrutiny,' the complaint will not survive Rule 12(b)(6) scrutiny." *See CBC Cos. v. Equifax, Inc.*, 561 F.3d 569, 572 (6th Cir. 2009) (quoting *NicSand*, 507 F.3d at 451).

Here, Vitamin Energy has not adequately pleaded facts that substantiate an antitrust injury. Specifically, Vitamin Energy's complaint fails to allege that Defendants' counter rack placement and rebate agreements constitute an antitrust injury. First, a multi-year agreement between a supplier and a retailer amounts to legitimate competition, not an antitrust injury. *See NicSand*, 507 F.3d at 453 (finding that "[a] would-be supplier does not violate the antitrust laws by offering a multi-year agreement" in a market that regularly requires similar agreements). Oddly, Vitamin Energy admits that it entered into

a counter rack placement and rebate agreement with Pilot that mirrors Defendants' allegedly anticompetitive agreements with Pilot and other convenience stores. (ECF No. 1, PageID.19–23 ("Vitamin Energy secured a contract to place Vitamin Energy retail display racks on the counter near the cash register at over 500 Pilot Flying J convenience stores in 2020.").) Vitamin Energy does not attempt to make a distinction between its agreement and the Defendants' agreement, so the Court will logically assume that a counter placement agreement with retailers is not out of the norm in the energy drink business.

To the extent that Vitamin Energy alleges that Defendants' agreements required some level of exclusivity, this argument is weakened by Vitamin Energy's continued presence in Pilot stores. As the Court will address in more detail below, simply losing a competitive placement on the counter does not harm competition overall where Vitamin Energy has alleged that it continued to make substantial profit at Pilot even *after* allegedly losing its counter placement. (*See* ECF No. 1, PageID.24–25.) Therefore, the Court is inclined to deem Vitamin Energy's harm as a natural result of legal competition and not as an antitrust injury. Further, since these counter placement agreements

12

seem to be within the norm of retail contracts for energy shot companies, nothing in Vitamin Energy's complaint clearly states why Defendants' agreements are anticompetitive per se.

Vitamin Energy does not allege that Defendants used illegitimate means to secure the same type of agreement that Vitamin Energy obtained. Although Vitamin Energy repeatedly refers to Defendants' agreements as "illegal" and "anticompetitive", these are conclusory statements that are unsupported by factual allegations. (*See generally id.* at PageID.23–26.) Instead, Vitamin Energy claims that stores like Pilot were "induced" and "incentivized" to enter agreements with Defendants without alleging specific facts that would make these agreements illegal. Therefore, without allegations that Defendants used illegal means to secure their counter rack placement and rebate agreements, the Court cannot find that the agreements themselves constitute an antitrust injury. *See NicSand*, 507 F.3d at 453 (finding that claimant's complaints about a multi-year agreement that offered a retailer substantial price discounts was unavailing, in part, because there were no allegations that the agreement was obtained illegally).

Second, Vitamin Energy's complaint fails to allege that Defendants' counter rack placement and rebate agreements caused market harm because Vitamin Energy's claims are speculative. According to Vitamin Energy's complaint, market harm should be assumed because placement on the counter next to the register "is the only efficient way for a new [energy shot] competitor to develop the consumer trials and sales necessary to meaningfully compete." (ECF No. 1, PageID.26–27.) However, Vitamin Energy offers no factual support for this claim outside its own personal loss in profits allegedly caused by Defendants' counter rack placement and rebate agreements. Nevertheless, even if profit loss could substantiate its claims, Vitamin Energy's profit loss is not significant enough to support the existence of market harm.

Vitamin Energy alleges that it made over $225,000 in sales through its Pilot agreement in 2020, which decreased to approximately $150,000—about a 30% drop in profit—after Pilot entered an agreement with Defendants in 2021. (ECF No. 1, PageID.24–25.) However, Vitamin Energy has pleaded no facts that show that Defendants' agreement with Pilot impacted Vitamin Energy's Pilot sales. Regardless, to the extent that there is a causal connection, "one competitor may not use the

14

antitrust laws to sue a rival merely for vigorous or intensified competition." *NicSand*, 507 F.3d at 450. A 30% decrease in profit over a single year can hardly substantiate an antitrust injury without additional factual support. Additionally, Vitamin Energy's other claims—that its products were relegated to less prominent placements or removed from Pilot stores—are the natural results of rigorous competition, not antitrust violations.

Ultimately, even viewing the facts in the light most favorable to Vitamin Energy, the complaint fails to allege market harm. The conclusory statement that "other energy shots—not just Vitamin Energy's—. . . suffered significant sales declines due to Defendants' anticompetitive and illegal exclusive placement agreement" is unsupported by any facts. (ECF No. 1, PageID.26.) Vitamin Energy failed to show that its own Pilot profit losses were significant, so its claim that other energy shot suffered "significant" profit losses is attenuated.

Similarly, Vitamin Energy's claim that product placement on the counter is "the only efficient way for a new competitor to develop the consumer trials and sales necessary to meaningfully compete" is unpersuasive. (*Id.* at PageID.26–27.) Vitamin Energy's own complaint

contradicts this argument, since Vitamin Energy still made approximately $150,000 in Pilot sales profits *after* its products were allegedly removed from Pilot counters. (*See id* at PageID.24–25.) This supports a finding that there are certainly other means by which energy shot products can compete and make profit outside of counter placement. Therefore, Vitamin Energy's speculations about the importance of counter placement, with no additional factual support, fail to establish antitrust standing. Accordingly, Vitamin Energy fails to establish antitrust standing and, thus, Defendants' motion to dismiss Vitamin Energy's monopoly claim is **GRANTED**.

### ii.  Attempted Monopoly Claim (Count II)

To bring a successful attempted monopoly claim, Vitamin Energy must show that: (1) Defendants had a specific intent to monopolize; (2) Defendants engaged in anti-competitive conduct; and (3) Defendants had a dangerous probability of successfully establishing a monopoly. *Smith Wholesale Co. v. Philip Morris USA, Inc.*, 219 F. App'x 398, 409 (6th Cir. 2007). Here, Vitamin Energy relies upon the same allegedly anticompetitive conduct that supported their monopoly claim: Defendants' counter placement and rebate agreements. However, the

Court has already found that Defendants' agreements do not amount to anti-competitive conduct. Therefore, Vitamin Energy's attempted monopoly claim similarly fails. Accordingly, Defendants' motion to dismiss Vitamin Energy's attempted monopoly claim is **GRANTED**.

### B. False Advertising Under 5 U.S.C. § 1125(a)(1)(B)

The Lanham Act prohibits companies from using, "in commerce . . . false or misleading description . . . or representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities . . . of his or her . . . goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). To bring a successful false advertising claim, Vitamin Energy must show: (1) Defendants made a false or misleading statement of fact about their product or service, (2) the statement actually deceived or tended to deceive a substantial portion of the message's intended audience, (3) the statement likely influenced the intended audience's purchasing decisions, (4) Defendants introduced the statement in interstate commerce, and (5) a causal connection between Defendants' statement and harm to Vitamin Energy. *Grubbs v. Sheakley Group, Inc.*, 807 F.3d 785, 798 (6th Cir. 2015) (quoting *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of*

*Podiatric Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir. 1999)). A statement of fact is defined as a "specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." *FedEx Ground Package Sys., Inc. v. Route Consultant, Inc.*, 97 F.4th 444, 453 (6th Cir. 2024) (quoting *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 496 (5th Cir. 2000)).

Vitamin Energy pleads four grounds for its false advertising claims regarding Defendants' "Fixes Tired Fast" trademark:

(1)   that 5 Hour's statement "Fixes Tired Fast[]" is literally false standing alone[;]

(2)   that the statement is misleading standing on its own[;]

(3)   that the statement is literally false when viewed in the context of 5 Hour's previous ad campaign showing people with energy meters "restored" to 100%[;] and

(4)   that the statement is misleading when viewed in the context of the previous ad campaign.

(ECF No. 20, PageID.665; *see* ECF No. 1, PageID.51–53.)

Vitamin Energy also pleads that Defendants' Get Back to 100% Energy Ad made false factual affirmations and representations regarding consumers' energy levels being restored to 100% after consuming 5-hour ENERGY products. (ECF No. 1, PageID.47–53.)

18

### i.     Literal Falsity - "Fixes Tired Fast"

"The standard for proving literal falsity is rigorous." *Buetow v. A.L.S. Enterprises, Inc.*, 650 F.3d 1178, 1185 (8th Cir. 2011). "A literally false statement 'is bald-faced, egregious, undeniable, over the top.'" *FedEx Ground*, 97 F.4th at 453 (quoting *Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 513 (7th Cir. 2009)). A literally false statement must convey an unambiguously deceptive meaning and, therefore, a statement cannot be literally false if it reasonably conveys different meanings. *FedEx Ground*, 97 F.4th at 453 (citing *Wysong Corp. v. APN, Inc.*, 889 F.3d 267, 270 (6th Cir. 2018); *Buetow*, 650 F.3d at 1185). "A literally false message may be either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 735–736 (6th Cir. 2012) (internal quotation marks and citation omitted). "The greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion, however, the less likely it is that a finding of

literal falsity will be supported." *Id.* at 736 (internal quotation marks and citation omitted).

Vitamin Energy pleads that "Fixes Tired Fast", standing alone, is intended to convey the false impression that "Defendants' 5-hour ENERGY shots will always provide a complete cure to tiredness" is unavailing. (ECF No. 1, PageID.52.) Defendants counter this claim by arguing that their incontestable registered trademark in "Fixes Tired Fast" signifies that that the United States Patent and Trademark Office ("USPTO") has already found that their mark is not "deceptive, deceptively misdescriptive, or merely descriptive." (ECF No. 19, PageID.424–426.) Defendants further argue that "Fixes Tired Fast" is ambiguous and, therefore, cannot be classified as literally false. (ECF No. 19, PageID.426–429.)

Defendants' reliance on the registered trademark status of "Fixes Tired Fast" as irrefutable proof that it is not literally false is not supported by much case law. Defendants cite to an out-of-circuit unreported case that offers little explanation for its finding. *See Vineyard House, LLC v. Constellation Brands U.S. Operations, Inc.*, No. 19-CV-01424-YGR, 2020 WL 95638, at *1 (N.D. Cal. Jan. 8, 2020) (citing *Mighty*

*Enterprises, Inc. v. She Hong Indus. Co. Ltd.*, 2015 WL 276771, \*3 (C. D.
Cal. 2015)) ("As a matter of law, a party cannot base a claim for false
advertising on a trademark owner's use of its own registered mark; this
is so where, as here, the registrations are incontestable."). While the
Court finds the fact that "Fixes Tired Fast" is a registered trademark
persuasive, it refuses to base its finding on that premise. Nevertheless,
even if the Court does not consider Defendants' registered trademark
argument, the Court still finds that the trademark is not literally false
standing alone.

Vitamin Energy's claim that "Fixes Tired Fast" is intended to
convey the false impression that "Defendants' 5-hour ENERGY shots will
always provide a complete cure to tiredness" is unavailing. (ECF No. 1,
PageID.52.) The statement "Fixes Tired Fast" does not, standing alone,
imply that it is a complete cure to tiredness. Instead, the trademark
implies that consumers can expect to alleviate tiredness quickly after
using the energy drink. Being tired, which is an unavoidable state of
human existence, could not be reasonably eradicated with an energy
drink. Additionally, nothing in the phrase "Fixes Tired Fast" promises to

eradicate tiredness permanently, and no reasonable consumer would interpret it as such.

Furthermore, the Court agrees with Defendants' argument that "Fixes Tired Fast" is an ambiguous statement. "Fixes Tired Fast" refers to quick relief from tiredness, which itself could be interpreted in a number of different ways. The use of the term "fast" allows room for variation in how quickly the product works. Similarly, the word "tired" could also be interpreted as minor fatigue or more serious physical depletion. Regardless of the interpretation adopted by a consumer, it is clear that Vitamin Energy's complaint does not satisfy the rigorous standard of proving that "Fixes Tired Fast" is literally false.

The Court further finds that "Fixes Tired Fast" is puffery. Puffery refers to unverifiable exaggeration to prove a point, bald assertions of superiority, and predictions of future events. *FedEx Ground*, 97 F.4th at 453 (citations omitted). "Puffery protects statements that reasonable consumers would not interpret as reliably factual." *La.-Pacific Corp. v. James Hardie Bldg. Prods.*, 928 F.3d 514, 519 (6th Cir. 2019) (citing *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999)). Nevertheless, context could transform unactionable

22

puffery into an empirically verifiable, factual claim. *Id.* (citing *Am. Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387, 391 (8th Cir. 2004)).

The use of the word "fast", which is not measurable and subjective, supports the Court's finding that "Fixes Tired Fast" is puffery. *Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 644 (S.D.N.Y. 2011) ("Indeed, terms like 'blazing fast' and 'fastest, easiest' are classic examples of generalized puffery."); *see also Coastal Abstract Serv. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999) (finding that a statement was not actionable under the Lanham Act because "[i]t was not a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact."). Therefore, Vitamin Energy's claim that "Fixes Tired Fast" is literally false fails.

### ii.   Misleading - "Fixes Tired Fast"

"A claimant can also seek to recover on a false-advertising claim by showing that the defendant made a misleading statement of fact." *FedEx Ground*, 97 F.4th at 453–454. A misleading statement is defined as "literally true, yet deceptive, or too ambiguous to support a finding of literal falsity[.]" *Am. Council*, 185 F.3d at 614. To succeed on this ground

23

for its false advertising claim, Vitamin Energy must show that a "significant portion of reasonable consumers were actually deceived by the [Defendants'] messaging." *Wysong*, 889 F.3d at 271 (internal quotation marks omitted) (quoting *Am. Council*, 185 F.3d at 616). However, at the motion to dismiss stage, Vitamin Energy can satisfy the actual deception requirement if their "complaint support[s] a plausible inference that the challenged advertisements in fact misled a significant number of reasonable consumers." *Wysong*, 889 F.3d at 271. Nevertheless, "a complaint may not baldly assert that a challenged statement is false or misleading[;] [i]t must explain why and how it is so." *FedEx Ground*, 97 F.4th at 454 (citations omitted).

Here, Vitamin Energy's complaint does not support a plausible inference that "Fixes Tired Fast", standing alone, misled a significant number of reasonable consumers. As discussed above, Vitamin Energy's argument that consumers were led to believe that "Fixes Tired Fast" suggests a complete cure to tiredness is unreasonable. (*See* ECF No. 1, PageID.52.) Since a reasonable consumer could not assume that "Fixes Tired Fast" conveys a complete cure for tiredness, Vitamin Energy cannot successfully plead a claim that the trademark is misleading based upon

24

its "complete cure" interpretation. Therefore, Vitamin Energy's claim that "Fixes Tired Fast" is misleading fails.

### iii. Get Back to 100% Ads

Vitamin Energy pleads that Defendants' Get Back to 100% Ads are literally false and/or misleading. (ECF No. 1, PageID.47–53.) Specifically, Vitamin Energy claims that the visual representation of consumers with depleted energy meters above their heads who then have their energy restored to 100% after consuming 5-hour ENERGY is a misleading factual representation. (ECF No. 1, PageID.47–48.) Similarly, Vitamin Energy pleads that the statement that 5-hour ENERGY would "recharge [a consumer's] batteries, all the way back to 100%, fast" is literally false and/or misleading. (*Id.* at PageID.48.) Vitamin Energy also pleads that "[t]he statement that 5-hour ENERGY users will get all the way back to 100% energy by consuming a 5-hour ENERGY shot" is literally false and/or misleading. (*Id.*) Lastly, Vitamin Energy pleads that the advertisements are literally false and/or misleading because they intend to convey that 5-hour ENERGY shots are superior to other energy shots on the market. (*Id.* at PageID.49.)

Defendants argue that Vitamin Energy's complaint is conclusory because it does not support a plausible inference that the Get Back to 100% Ads deceived a substantial portion of the intended audience into believing that consuming 5-hour ENERGY results in a consumer regaining 100% of their energy. (ECF No. 19, PageID.430.) Defendants further argue that no reasonable consumer would believe that 5-hour ENERGY impacts a literal battery over their heads that would reach 100% after consuming 5-hour ENERGY. (*Id.* at PageID.431.) Defendants believe that the statements and representations made in the Get Back to 100% Ads, when contextualized, "simply convey the message that if [a consumer is] feeling drained, [the consumer could] take 5-hour ENERGY and receive an energy boost." (*Id.* at PageID.431–432.) Ultimately, Defendants characterize the challenged advertisements as puffery because they are subjective, non-specific, and non-measurable. (*Id.* at PageID.431–432.) Lastly, Defendants refute that their Get Back to 100% Ads convey that 5-hour ENERGY shots are superior to other energy shots on the market because the advertisements are not comparative and make no mention of other energy shots. (ECF No. 19, PageID.434.)

26

Here, Vitamin Energy does not plead sufficient facts to show that any of the aforementioned aspects of the Get Back to 100% Ads are literally false or misleading because the statements are puffery. Looking to the visual representations of consumers with batteries above their head, the Court agrees with Defendants' position that the advertisement constitutes unverifiable exaggeration. Even if a consumer did not take the visual at face value, the assumption that 5-hour ENERGY would quantifiably increase energy level to 100% is unreasonable. Tiredness is subjective, as is the state of a person returning to 100% energy. The use of percentages evokes comparisons to a cellphone battery, and seems to symbolically convey that 5-hour Energy would make a consumer feel "recharged". Therefore, the visual of battery's charged to 100% in the Get Back to 100% Ads is unactionable puffery.

The same could be said regarding Vitamin Energy's claims that the statement "recharge your batteries, all the way back to 100%, fast", and "5-hour ENERGY users will get all the way back to 100% energy by consuming a 5-hour ENERGY shot". (*See* ECF No. 1 at PageID.48.) Again, it would not be reasonable for a consumer to believe that the aforementioned statements were attesting to a quantifiable outcome as a

result of consuming 5-hour ENERGY. Both statements qualify as unverifiable exaggeration because there is no way to objectively define what 100% energy is, and there is no measurable way to determine if a consumer has reached 100% energy. Therefore, Vitamin Energy's claim that the Get Back to 100% Ads are literally false and/or misleading fails.

Lastly, Vitamin Energy pleads that "Fixes Tired Fast", in conjunction with the Get Back to 100% advertisement, is literally false and/or misleading because it conveys to a consumer that consuming 5-hour ENERGY will quantifiably increase a consumers' energy levels to 100%. (ECF No. 1, PageID.PageID.51.) As discussed in detail above, the Court has already found that the representations made in the Get Back 100% Ads are puffery. The Court has also already found that "Fixes Tired Fast" is puffery. Therefore, Vitamin Energy's claim that "Fixes Tired Fast", when contextualized with the Get Back to 100% advertisements, is literally false and/or misleading fails. Accordingly, since all of Vitamin Energy's grounds for its false advertising claim are unavailing, Defendants' motion to dismiss is **GRANTED** as to Vitamin Energy's false advertising claim.

## C. Civil Conspiracy

Vitamin Energy alleges that Defendants engaged in a civil conspiracy by entering the agreements that the Court analyzed to resolve Vitamin Energy's monopoly and attempted monopoly claims. (ECF No. 1, PageID.66.) "A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 670 N.W.2d 569, 580 (Mich Ct. App. 2003) (internal quotation marks omitted) (quoting *Admiral Ins. Co v Columbia Casualty Ins. Co.*, 486 N.W.2d 351, 358 (Mich. Ct. App. 1992)). However, "a claim for civil conspiracy may not exist in the air; rather, it is necessary to prove a separate, actionable tort." *Elias v. Fed. Home Loan Mortg. Corp.*, 581 F. App'x 461, 469 (6th Cir. 2014) (internal quotation marks omitted) (quoting *Advocacy Org.*, 670 N.W.2d at 580). Since the Court has already dismissed Vitamin Energy's monopoly and attempted monopoly claims, this claim must also be dismissed. Accordingly, Defendants' motion to dismiss is **GRANTED** as to Vitamin Energy's civil conspiracy claim.

## IV.   STRIKING PARAGRAPH 14(d) FROM THE COMPLAINT

Defendants have asked the Court to strike language from Vitamin Energy's complaint that claims Bhargava is "widely alleged to have created a complex corporate structure to cheat on his taxes and defraud the US." (ECF No. 1, PageID.6; ECF No. 19, PageID.439.) Such language is irrelevant and immaterial to this case. Therefore, the Court may strike the sentence from Vitamin Energy's complaint pursuant to Fed. R. Civ. P. 12(f). Accordingly, the sentence is **STRICKEN**.

## V.   CONCLUSION

For the reasons stated above, **IT IS ORDERED** that Defendants' motion to dismiss (ECF No. 19) is **GRANTED**.

**IT IS FURTHER ORDERED** that paragraph 14(d) of Vitamin Energy's complaint (ECF No. 1) is **STRICKEN**.

**IT IS FURTHER ORDERED** that the Court finds it futile to grant Vitamin Energy leave to amend their complaint because no plausible antitrust injury exists based upon the agreements at issue and no plausible false advertising claims exists based upon the advertisements and trademark at issue. *See Rose v. Hartford Underwriters Ins. Co.*, 203

F.3d 417 (6th Cir. 2000)("Leave to amend would be futile only if it could not withstand a Rule 12(b)(6) motion to dismiss.").

**IT IS FURTHER ORDERED** that Vitamin Energy's complaint is **DISMISSED WITH PREJUDICE**. **This is a final order that closes the case.**

**SO ORDERED.**

<u>**s/Jonathan J.C. Grey**</u>
Jonathan J.C. Grey

Date: August 29, 2025          United States District Judge

## Certificate of Service

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 29, 2025.

<u>s/ **S. Osorio**</u>
Sandra Osorio
Case Manager